No. 100,543

In the Matter of J. GREGORY SWANSON, *Respondent*.

(200 P.3d 1205)

Opinion filed January 30, 2009.

*Stanton A. Hazlett*, disciplinary administrator, argued the cause and was on the brief for the petitioner.

*J. Gregory Swanson*, respondent, argued the cause and was on the brief pro se.

*Per Curiam*: This is an original contested proceeding in discipline filed by the Disciplinary Administrator against respondent, J. Gregory Swanson, of Liberal, an attorney admitted to the practice of law in Kansas in 1974.

A hearing panel of the Kansas Board for Discipline of Attorneys conducted an evidentiary hearing and found that Swanson violated nine rules of the Kansas Rules of Professional Conduct (KRPC):

KRPC 1.1 (2008 Kan. Ct. R. Annot. 400) (competence);

KRPC 1.3 (2008 Kan. Ct. R. Annot. 415) (diligence);

KRPC 1.4 (2008 Kan. Ct. R. Annot. 432) (communication);

KRPC 1.5 (2008 Kan. Ct. R. Annot. 448) (fees);

KRPC 1.16(a)(3) and (d) (2008 Kan. Ct. R. Annot. 508) (declining or terminating representation);

KRPC 3.2 (2008 Kan. Ct. R. Annot. 525) (expediting litigation);

KRPC 4.1 (2008 Kan. Ct. R. Annot. 552) (truthfulness in statements to others);

KRPC 8.1 (2008 Kan. Ct. R. Annot. 579) (bar admission and disciplinary matters); and

KRPC 8.4(c) (2008 Kan. Ct. R. Annot. 586) (misconduct).

In addition, the hearing panel concluded that Swanson violated Supreme Court Rule 207(b) (2008 Kan. Ct. R. Annot. 295) (duties of the bar and judiciary) and Supreme Court Rule 211(b) (2008 Kan. Ct. R. Annot. 313) (formal hearings).

After issuing a preliminary hearing report in which the panel made findings regarding these violations, the hearing panel allowed

the parties 14 days to forward a written closing argument and make recommendations as to the appropriate discipline. In response, the Disciplinary Administrator recommended that Swanson be indefinitely suspended from the practice of law, and Swanson sought an admonition. The panel unanimously adopted the Disciplinary Administrator's position, recommending this court indefinitely suspend Swanson from the practice of law.

Swanson filed exceptions to the panel's findings and subsequently filed a brief with this court, although his brief did not comply with Supreme Court Rule 6.02 (2008 Kan. Ct. R. Annot. 38) (content of appellant's brief). Swanson was allowed to file an amended brief, but even the second brief did not fully comply with the Rule. Notably, Swanson failed to state specific issues. We mention this because his failure made it more difficult for the Disciplinary Administrator to respond to his arguments and for this court to discern the specifics of his arguments. It appears, however, that he challenges whether the hearing panel's findings are supported by clear and convincing evidence.

### Appellate Standard of Review

Attorney misconduct must be established by substantial, clear, convincing, and satisfactory evidence. See *In re B.D.-Y.*, 286 Kan. 686, 187 P.3d 594 (2008); *In re Comfort*, 284 Kan. 183, 190, 159 P.3d 1011 (2007); see also Supreme Court Rule 211(f) (misconduct to be established by clear and convincing evidence). The touchstone of the clear and convincing standard is that the evidence must establish that the truth of the facts asserted is "highly probable." *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 3. An appellate court reviewing a determination which is required to be based upon clear and convincing evidence considers whether, after review of all the evidence viewed in the light most favorable to the party with the burden of proof, it is convinced that a rational factfinder could have found the determination to be highly probable. *In re.B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4. In making this determination, the appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 699.

In attorney discipline cases, the hearing panel is the finder of fact. If the respondent does not take exception to a finding, it "shall be deemed admitted." Supreme Court Rule 212(c) (2008 Kan. Ct. R. Annot. 328). On the other hand, when exception is taken, this court must examine the record and determine if a rational fact-finder could have found the determination to be highly probable. See *In re B.D.-Y.*, 286 Kan. at 705; *In re Wenger*, 279 Kan. 895, 906, 112 P.3d 199 (2005).

### Application of Standard to Facts

As we apply this standard in this case, we note that Swanson does not dispute the panel's findings that he violated KRPC 8.1(b) and Supreme Court Rule 207(b) and Supreme Court Rule 211. Regarding KRPC 8.1 and Rule 207(b), the panel concluded:

"The Respondent knew that he was required to cooperate in the disciplinary investigation. The Respondent failed to comply with the direction of the Disciplinary Administrator and . . . the disciplinary investigator. Because the Respondent knowingly failed to cooperate in the disciplinary investigation, the Hearing Panel concludes that the Respondent violated KRPC 8.1(b) and Kan. Sup. Ct. R. 207(b)."

Regarding the violation of Supreme Court Rule 211(b), the panel noted that Swanson failed to timely file his answer. By that Rule, the answer must be filed 20 days after the filing of the complaint. Swanson waited almost 60 days, filing his answer just 8 days before the hearing.

As to the remainder of the violations found by the panel, we will consider separately three client complaints at issue: (1) A complaint that Swanson failed to timely pursue child support modifications on behalf of Lamar A. Chapman; (2) a complaint that Swanson failed to timely file a personal injury suit on behalf of Ramon Ybarra, and (3) a complaint that Swanson failed to timely complete a qualified domestic relations order on behalf of Barbara M. Swanson disagrees in some way with the hearing panel's findings regarding each of these complaints.

### DA9455—Complaint of Lamar A. Chapman

Regarding the complaint of Lamar A. Chapman, the hearing panel found the following facts by clear and convincing evidence.

On October 24, 1995, Chapman and Anitra M. West had a daughter. Thereafter, on June 21, 1999, the Child Support Enforcement Unit of the Kansas Department of Social and Rehabilitation Services (SRS) filed a petition for child support against Chapman. At that time, Chapman was a student at Kansas State University and a member of its football team. He agreed to pay $123 per month in child support, effective August 1, 1999.

In 2000, Mr. Chapman completed his college studies, and on June 16 of that year he signed a 4-year contract to play professional football for the Cleveland Browns. Then, on November 30, 2000, SRS filed a motion to modify child support. Chapman retained Swanson to represent him in the child support matter, and on December 21, 2000, Swanson filed a response to the motion to modify child support.

On July 6, 2001, the district court entered a journal entry, modifying the child support order effective January 1, 2001. Chapman was ordered to pay monthly child support in the amount of $2,198 from January 2001 through June 2001; then, from July 2001 through December 2001, Chapman's monthly child support obligation was $2,200. Chapman's monthly child support would increase to $2,594 for the months of January 2002 through October 2002. For the last 2 months in 2002, the court ordered Chapman's monthly child support to be increased to $2,992, because the child would have attained the age of 7. Beginning January 1, 2003, Chapman's monthly child support was to be $3,131.

On September 17, 2001, the district court issued an order to show cause why Chapman should not be held in contempt of court for failing to pay his child support, and Chapman was ordered to appear in court on October 19, 2001. While it is unclear what happened on October 19, the contempt citation was dismissed on January 7, 2002.

Sometime in September 2001, Chapman suffered a knee injury, and as a result of the injury, on September 20, 2001, the Cleveland Browns placed Chapman on the injured reserved list and reduced his pay by 50 percent. At that time, Chapman contacted Swanson and asked him to file a motion to modify his child support obligation. On October 9, 2001, Swanson filed a motion to reduce child

support. The district court considered the motion in January 2002 but only reduced Chapman's child support obligation for December 2001.

On May 31, 2002, the district court issued a second order to show cause why Chapman should not be held in contempt of court for failing to pay his child support. The court ordered Chapman to appear in court on July 16, 2002, but then the court continued the contempt hearing to September 11, 2002.

In August 2002, Chapman sustained a second knee injury while playing for the Cleveland Browns. As a result of this injury, the Cleveland Browns released Chapman from his employment in September 2002. Chapman received his final paycheck from the Cleveland Browns on September 11, 2002. Immediately after the Cleveland Browns released Chapman, he contacted Swanson and asked him to file a motion to modify the child support order. Swanson requested that Chapman forward a copy of the release via facsimile. Chapman's wife, Aris, on behalf of her husband, faxed Swanson a copy of the release that same day, but Swanson contacted the Chapmans and told them the copy was unreadable. As a result, Chapman's wife forwarded a copy of the release by mail.

After Swanson received a copy of the release in the mail, he called Chapman and confirmed that he received a copy of the release but told him that he was past due on his child support. Neither Chapman nor his wife recalled that Chapman was served with an order to show cause on June 15, 2002, nor did they recall Swanson informing them that a contempt citation was pending before the district court at that time.

Chapman was surprised that he was in arrears because the district court had previously issued an income withholding order. It appeared that the arrearage developed because the method in which Chapman was paid by the Cleveland Browns was not contemplated by the district court when establishing the income withholding order. In 2000, 2001, and 2002, Chapman received compensation under his contract with the Cleveland Browns on a weekly basis during the season. But the season was 16 or 17 weeks long, and Chapman did not receive compensation during the remainder of the year. The income withholding order did not take

Chapman's 17-week pay arrangement into consideration. Consequently, insufficient funds were withheld from Chapman's paychecks to satisfy the child support order.

After Swanson informed Chapman that he was behind on his child support, Chapman forwarded a check in the amount of $5,636.96 dated September 6, 2002, to the payment center for past due child support. Swanson informed Chapman that he needed to forward an additional amount of $5,000 to bring his obligation current. Therefore, that same day, Chapman forwarded $5,000 to the payment center. The next day, Swanson informed Chapman that he was in error in the amount of the past due child support and that Chapman needed to forward an additional $4,500 to the payment center to bring his child support obligation current. Therefore, Chapman complied.

Swanson assured Chapman that once he was current on his child support obligation, he would file a motion to modify the child support. Swanson, however, failed to file the motion as promised.

The September 11, 2002, hearing on the district court's order to show cause was continued because Chapman was no longer in arrears. That same month, the Chapmans moved from Cleveland, Ohio, to the Kansas City area. The Chapmans and Mr. Chapman's mother, Sadie Madden, repeatedly contacted Swanson to inquire about the status of the motion to modify the child support order. Swanson told them that he was working on it, that these things take time, that it was still in the court, and that they were just trying to decide how much Chapman really owed. Despite the repeated inquiries, Swanson still did not file a motion to modify the child support.

On February 9, 2004, the district court issued to Chapman an order to appear in court on March 9 and to show cause for failing to pay child support. Chapman, however, was not served with the order to appear. Then, on April 13, 2004, the court issued another order to appear and show cause regarding Chapman's failure to pay child support, and Chapman was served with the order.

On the date of the hearing in May 2004, the Chapmans traveled from their home in the Kansas City area to Liberal, Kansas. As they walked into the courthouse, they met Swanson who asked them

what they were doing there. The Chapmans explained that they were there for court on the order to show cause. Swanson told the Chapmans that the case had been continued. According to court documents, "[t]he matter was continued by agreement of the parties to [August 27, 2004, to] resolve the issues and/or exchange discovery."

· Because the April 13, 2004, order to appear and show cause directed Chapman to "bring with you to the hearing any paycheck stubs or other documentation of wages, earnings, or other income for the preceding twelve months," he had brought his 2003 income tax return. Thus, on that date, the Chapmans provided Swanson with a copy of their 2003 tax returns.

While in Liberal for the hearing, the Chapmans examined the court file and discovered that Swanson had not filed a motion to modify the child support. Mrs. Chapman asked Swanson why there was no motion to modify the child support in the court file. At the disciplinary hearing, Mrs. Chapman testified as follows regarding this conversation:

"A. [By Mrs. Chapman] . . . I went around to the clerk's office and asked for a copy of the file and that's when I looked through the file and I never saw anything about the current motion that he told us he had filed for the—to get it reduced. And so when we went back out there we said—I said to him personally how come there's no evidence of it in the file. And at first he said he didn't know. And by this time we were very upset and we were arguing—my husband and I were standing there arguing with him like what do you mean you don't know, wouldn't it be in there if you did it and he was like I did it, I don't know why it's not in there.

. . . .

"Q. [By Mr. Hazlett] When you asked Mr. Swanson about the . . . motion for modification, what did he say?

"A. He said that he had done it. It was—it was really strange, he said like five different things. He had done it, he didn't know why it wasn't in there. Then at one point he said, oh, well, I was waiting on Sadie to tell me that I needed to do it, my husband's mother. I was working on it. I mean, it was—it was the strangest conversation."

Swanson did not inform Chapman that the hearing had been continued to August 27, 2004, which resulted in another continuance to September 22, 2004. At that time, Chapman appeared in person and with Swanson. The district court determined that

Chapman was past due on his child support in the amount of $69,684.48 and, as a result, held him in contempt of court. He was sentenced to 60 days in jail for the contempt, but the court suspended the imposition of the jail sentence conditioned upon Chapman paying $300 a month in child support for October, November, and December 2004. The district court did not modify the child support order, however, because no motion had yet been filed.

It was not until more than 2 years after Chapman had been released by the Cleveland Browns and had repeatedly asked Swanson to file a motion to modify that Swanson finally filed a motion to modify Chapman's monthly child support. But Swanson failed to have the matter scheduled for a hearing.

On October 13, 2004, the district court issued an order confirming a garnishment of Chapman's assets. Then, in December 2004, Merrill Lynch liquidated the entire balance of Chapman's account and paid $45,429.76 into the court, and Bank of America liquidated the entire balance of Chapman's account and paid $2,490 into the court. After the accounts were liquidated, Chapman no longer had any assets.

The motion to modify child support was eventually set for a hearing on January 19, 2005. At the hearing, Swanson failed to introduce evidence of Chapman's income, and SRS failed to introduce evidence of Anitra West's income. As a result, the case was continued, and Chapman's child support continued to accrue at $3,131 per month.

In February 2005 Chapman filed a complaint against Swanson with the Disciplinary Administrator's office.

Eventually, the district court heard Chapman's case again on December 2, 2005. Despite the fact that Chapman had filed a disciplinary complaint against Swanson 10 months earlier, Swanson appeared with Chapman. Unfortunately, Swanson and the attorney for SRS had previously failed to exchange financial information regarding the parties. At the conclusion of the hearing, the district court ordered Swanson to prepare the journal entry for the December 2 hearing; Swanson failed to do so. Thereafter, Swanson failed to take any additional action to get Chapman's motion to

amend child support before the district court. Accordingly, Chapman terminated Swanson's legal representation.

On October 27, 2006, the district court issued to Chapman an order to appear in December 2006 and to show cause for failing to pay the monthly child support of $3,131. After the order to show cause was issued, the Chapmans retained Jacob Fitzgerald to represent them. Chapman appeared with Fitzgerald at the scheduled hearing, and Fitzgerald requested a continuance to allow him time to obtain a copy of the transcripts of the previous hearings. He also asked the Chapmans and Mrs. Madden to obtain a copy of Swanson's file.

Although Mrs. Madden requested that Swanson provide her with a copy of the file so she could forward it to Fitzgerald, Swanson never did so. The district court took up the matter on February 26, 2007. Finding that Chapman continued to owe past due child support in the amount of $23,826.72, the district court ordered him to pay $200 per month toward the arrearage. The court also dissolved the contempt proceeding which had originated on September 22, 2004, and dismissed the contempt proceeding which had originated on October 27, 2006.

In determining whether to make the motion to modify the child support retroactive to 30 days after the motion was filed, the court queried:

"Should [Chapman] benefit from a retroactive modification of his child support obligation to thirty (30) days after it was filed when he hasn't timely prosecuted the motion? The Court recalls [Swanson] complaining about how difficult it was to get financial information from Mr. Chapman."

The court reduced Chapman's child support obligation to $181 per month, and, despite its hesitation, made the modification effective November 1, 2004.

The hearing panel found the basis of the court's hesitation to be unfounded or at least the blame to be misplaced, concluding that Chapman had timely provided financial information to Swanson but that Swanson failed to timely present the information to the district court. Also, the panel found that if Swanson had filed a timely motion to modify Chapman's child support, his child sup-

port obligation for the months of November 2002 through September 2004 may very well have been reduced by approximately $181 to $300. According to the hearing panel's calculations, Chapman's total child support from November 2002 through September 2004 was $71,735 when, in all likelihood, it should have been between $4,163 and $6,900. Thus, Swanson's misconduct cost Chapman between $64,835 and $67,572.

Based upon these facts, the panel found several rule violations. Focusing upon Swanson's failure to timely file a motion to modify child support in September 2002, the panel found he violated KRPC 1.1 because his representation was not competent and KRPC 1.3 because his representation was not diligent. Also, the panel found that Swanson violated KRPC 1.4(a) because he failed to keep Chapman reasonably informed about the status of the matter or failed to provide requested information. Finally, the panel found a violation under KRPC 8.4(c) for engaging in dishonest conduct when he (1) proffered to the court that Chapman failed to timely provide requested financial documents, (2) testified at the disciplinary hearing that neither Chapman nor anyone on his behalf asked Swanson to file a motion to modify child support, (3) testified that neither Chapman nor anyone on his behalf provided Swanson with a letter of release from the Cleveland Browns, and (4) provided the Chapmans and Mrs. Madden with false information about filing the motion to modify child support.

After the panel made these (and other) findings in its preliminary report, Swanson submitted his written recommendation regarding the appropriate sanction and, in doing so, presented some additional arguments. Although the panel did not address all of these arguments in its final report, it addressed Swanson's argument that Chapman did not provide a domestic relations affidavit prior to September 22, 2004, and as a result Swanson could not have filed a motion to modify child support any earlier. The panel rejected this argument, stating:

"The Hearing Panel recognizes that Kan. Sup. Ct. R. 139(a) provides:

'Applications for ex parte orders which include requests for temporary support and all motions to modify existing support orders shall be accompanied by a Do-

mestic Relations Affidavit. The form of the affidavit is set forth in the appendix of the Kansas Child Support Guidelines.'

"Despite Kan. Sup. Ct. R. 139(a), the Hearing Panel finds that the Respondent's argument, that he did not file the motion to modify until September 22, 2004, because Mr. Chapman did not provide him with a domestic relations affidavit until that date, lacks merit for two reasons. First, the Respondent previously filed a motion to modify child support in behalf of Mr. Chapman in October 2001, without attaching a domestic relations affidavit to the motion. The Respondent testified regarding this at the hearing:

'CHAIRMAN [of the hearing panel]: Mr. Swanson, not having a domestic relations affidavit filed contemporaneous with the filing of the motion in October of 2001, did you ever file that affidavit prior to the time that the court considered the reduction in child support in January of '02?

. . . .

'MR. SWANSON: No.

'CHAIRMAN . . . : And I certainly would grant leave to you during any break or anything if you want to go through the file again to make sure that what you're telling us now is correct. I don't want to put you on the spot to go through a 300-page file and tell us whether or not something is there. But at least at this point it doesn't look like there was an affidavit filed at any time prior to the court determining the motion to modify in January of 2002, correct?

'MR. SWANSON: Yeah. I've already said no, yeah.'

"The Respondent's argument that he could not file a motion to modify child support in behalf of Mr. Chapman until Mr. Chapman provided him with a domestic relations affidavit is disingenuous because the Respondent did just that in October 2001.

"Second, the Respondent's argument that he could not file a motion to modify child support in behalf of Mr. Chapman until Mr. Chapman provided him with a domestic relations affidavit also lacks merit because the Respondent failed to inform Mr. Chapman of that fact. The Respondent did not forward a single letter to Mr. Chapman during the two-year time period instructing Mr. Chapman as to what was needed to file a motion to modify. In fact, when Mr. and Mrs. Chapman and Mrs. Madden contacted the Respondent he informed them that he was working on it, that these things take time, that it was still in the court, and that they were just trying to decide how much he really owed. Accordingly, the Respondent's argument that he filed the motion to modify child support at his first opportunity lacks merit."

The panel cited this evidence as additional support for its previous conclusions that Swanson had not been diligent in pursuing the motion and had not adequately communicated with his client.

### Swanson's Disputes Regarding Chapman's Complaint

Swanson disputes these conclusions, stating Chapman made "a mere allegation that [a motion to modify child support] should have been filed in 2002." He argues he was not asked by Chapman (or anyone on Chapman's behalf) to file a motion to modify child support in 2002. He further asserted at the hearing before this court that he had never been paid to file a motion. In addition, he argues he did not have the information he needed to file the motion. Swanson denies ever having received Chapman's letter of employment release from the Cleveland Browns and claims that he had a difficult time obtaining financial documents from Chapman in order to file a motion to modify child support.

In other words, Swanson asks this court to accept his version of the facts rather than accept the findings of the hearing panel.

### Conclusion Regarding Chapman's Complaint

Swanson does not appreciate that this court does not reweigh credibility. And, in this instance, we are not left to infer how the hearing panel viewed the credibility of various witnesses. The panel explained:

"While Mr. Chapman's testimony and his mother's testimony was credible, there were minor conflicts in their testimony regarding how the release was transmitted to the Respondent. Despite the minor conflicts in their testimony, the overall conclusion to be gleaned from the testimony of all three is that the Respondent received a copy of Mr. Chapman's release from the Cleveland Browns.

. . . .

"From the record, it is clear, that Mrs. Chapman is the person who maintains the records and handles the business of the family. And, it is Mrs. Chapman's testimony that convinced the Hearing Panel of exactly what occurred. Mrs. Chapman testified specifically about how and when they provided a copy of the release . . . .

"Additionally, Mrs. Chapman's testimony about specific conversations she had with the Respondent about why the motion to modify had not been filed was credible, clear, and convincing."

In addition, we note there are verifiable facts that support the Chapmans' version of events. For example, it is undisputed that after Chapman's first injury, when his salary was reduced by half, Swanson filed a motion to modify child support after Chapman

provided the information necessary to do so. The fact that Chapman pursued a reduction on that occasion, when the reduction of income was only temporary, suggests he would do so later when his income was permanently reduced. Certainly, Chapman had an incentive to pursue the reduction. And the fact that Chapman made payments of $5,636.96, $5,000 and $4,500 to cure the child support arrearage in early September 2002, supports Chapman's claim that at that point in time he was discussing with Swanson the need to have the arrearage paid before the court would favorably entertain a motion to modify the monthly obligation.

Moreover, it is undisputed that the Chapmans made a trip from the Kansas City area to Liberal in May based upon incorrect information regarding a hearing. Additionally, at that time the Chapmans examined the court file and determined the motion they expected to have been filed several months earlier was not in the court file. Their outrage, which is confirmed by Swanson's testimony, confirms that the Chapmans had an expectation that a motion would have been filed and advanced to a hearing.

Based upon this evidence, we conclude the Disciplinary Administrator presented clear and convincing evidence that

- Swanson's failure to timely file a motion to modify was a violation of KRPC 1.1 (competence) and KRPC 1.3 (diligence);
- Swanson's failure to inform the Chapmans of the status of the motion or hearing dates and continuances was a violation of KRPC 1.4 (communication); and
- Swanson's (1) proffer to the court that Chapman failed to timely provide requested financial documents, (2) testimony at the disciplinary hearing that neither Chapman nor anyone on his behalf asked Swanson to file a motion to modify child support, (3) testimony that neither Chapman nor anyone on his behalf provided Swanson with a letter of release from the Cleveland Browns, and (4) false communication to the Chapmans and Mrs. Madden regarding the filing of the motion to modify child support was dishonest conduct and a violation of KRPC 8.4(c) (misconduct).

### DA9456—Complaint of Ramon Ybarra

With regard to Ybarra's complaint, the hearing panel found the following facts. On January 7, 1998, Ybarra was involved in an automobile accident in Seward County, Kansas. Humberto Lopez, driving a vehicle in the opposite direction of Ybarra, crossed the center line and struck Ybarra's vehicle head-on. After that collision, a vehicle driven by Roger Schultz and owned by Diamond F. Corporation, struck Ybarra's car from behind. As a result of the accident, Ybarra suffered significant injuries.

Ybarra retained Swanson to file a civil suit seeking damages for his injuries, and Swanson accepted the representation on a contingency fee basis. However, Swanson failed to reduce the agreement to writing. On November 1, 1999, Swanson filed suit on behalf of Ybarra. At the time Swanson filed the cause of action, he also filed a document titled "Declaration of No Service of Summons." In that document, Swanson directed the clerk of the district court to refrain from issuing summonses to the defendants. At the disciplinary hearing on this matter, Swanson offered no explanation for declining to have the defendants served at the time he filed the case.

After Swanson filed suit, Ybarra had difficulty reaching him to obtain information regarding the status of his case. On the occasions when Ybarra was able to reach Swanson, he assured Ybarra that he was actively pursuing the personal injury case. Yet, despite assurances to the contrary, after filing suit Swanson took no additional action to prosecute the case or to obtain service of process on the defendants.

On May 19, 2000, the district court issued a "Notice of Intent to Dismiss by the Court for Lack of Prosecution." After Ybarra received the court's notice and because Swanson had not made any progress in the case, Ybarra contacted Diane Barger and requested that she enter her appearance on Ybarra's behalf in the pending personal injury litigation. Barger insisted that Ybarra terminate Swanson's representation in writing before she would enter her appearance.

On May 24, 2000, Ybarra forwarded a letter terminating Swanson's representation. The letter provided:

"This letter is to inform you that since we aren't making any progress on my injury case, I have no other alternative but to look for other counsel to represent me on this matter. So as of May 24, 2000 you are hereby terminated. As to my case file please turn it over to the attorney that I have hired to represent me on this matter."

Ybarra retained Barger, and they entered into a written agreement. Then, on May 27, 2000, Barger wrote to Swanson requesting that he forward her a complete copy of Ybarra's file. Ybarra also executed a release, authorizing Swanson to forward his file to Barger, and on June 8, 2000, an employee of Barger's picked up the file from Swanson.

Barger had learned that Swanson had never obtained service of process on the defendants in Ybarra's civil suit. On June 2, 2000, Barger put Swanson on notice that his failure to obtain service on the defendants amounted to negligent representation of Ybarra. He did not respond to Barger's letter. After obtaining the court's permission for more time to obtain service on the defendants, Barger served the defendants with copies of the summons in July 2000.

After Ybarra terminated Swanson's legal representation and retained Barger, Swanson continued to contact Ybarra and to act on his behalf—in one instance by contacting the insurance carrier. Barger wrote to Swanson and directed him to stop contacting Ybarra, but Swanson did not respond to Barger's letter.

At some point, attorney Randall E. Fisher joined Barger in the representation of Ybarra. After Schultz and Diamond filed their answer to Ybarra's first amended petition, they filed a motion to dismiss based on the statute of limitations. Thereafter, Fisher wrote to Swanson to put him on notice that he faced a potential legal malpractice claim and to ask him to forward any evidence which could be used in defense to the motion to dismiss. Swanson did not respond to Fisher's letter. On March 19, 2001, the district court granted the motion to dismiss filed by Schultz and Diamond.

Despite the statute of limitations, Lopez agreed to settle the suit by paying Ybarra the insurance policy limit of $25,000, presumably to avoid litigation costs. Also, because Ybarra's injuries exceeded Lopez' insurance policy limit, Ybarra's underinsurance policy, with a $1 million limit, applied. Utica National Assurance Company was

the insurance provider for Ybarra's underinsurance policy, and at some point, Utica intervened in the suit.

Utica failed to effect a timely substitution of its $25,000 for the liability policy limits applicable to Lopez, and, as a result, Ybarra's case proceeded against Utica. At a bench trial, the court found Lopez 75 percent liable and Schultz 25 percent liable. Further, the court determined Ybarra's damages to be $456,000. Utica was ordered to pay $317,000 less the previous payment of personal injury protection (PIP) benefits in the amount of $27,000, for a net judgment of $290,000. Utica paid the judgment.

Because the district court found Schultz 25 percent liable, it attributed $114,000 of Ybarra's damages to Schultz. Ybarra was unable, however, to collect that portion of his damages from Schultz because Schultz and Diamond had been dismissed from the suit due to the failure to comply with the statute of limitations.

On August 1, 2002, Barger wrote to Swanson again and updated him regarding the status of the case. She also notified him that Ybarra would be proceeding against him to collect the $114,000. Again, Swanson failed to respond to Barger's letter.

Because Ybarra was unable to collect that portion of his damages from Schultz, Barger and Fisher filed suit in the United States District Court for the District of Kansas against Swanson seeking damages in the amount of $114,000. In a letter to Fisher, dated January 3, 2003, Swanson alleged that his attorney-client relationship with Ybarra "was terminated by [Ybarra] and that [Swanson] was advised by [Ybarra] that [Ybarra] was hiring another attorney before time for service of process expired."

On February 10, 2003, Swanson filed a third-party petition against Barger alleging that she was attorney of record and that any damages were the result of Ybarra's negligence and Barger's negligence. Then, in a document sent June 9, 2003, Swanson asserted:

"[Swanson] denies that [he] failed to timely prosecute the case. [Swanson] denies that [he] failed to obtain timely service of process on the Defendants in that case. [Swanson]'s relationship as attorney for [Ybarra] was terminated by [Ybarra]; and [Swanson] was advised by [Ybarra] that [he] was hiring another attorney before time of service of process had expired. [Ybarra] knew of the expiration of time to

issue service of process and advised [Swanson] that [Ybarra] was hiring another attorney and would issue the service of process all before the time expired to issue service of process."

On June 19, 2003, Swanson requested that Fisher include the following passages in the pretrial order:

"[64] 2. Estoppel. [Ybarra] terminated the contractual relationship between [Ybarra] and [Swanson] shortly after November 1999, thereby relieving [Swanson] from any further contractual responsibility by [Swanson] due [Ybarra].

. . . .

"[64] 2. [Swanson] was advised by [Ybarra] before the service of process deadline, that [he] was terminating the contractual relationship between [Ybarra] and [Swanson], and that [Ybarra] had already hired a new attorney and advised the new attorney of the status of the case and service of process issues. If that new attorney did not issue service of process, then that negligence, if any should be compared to the [Ybarra] and [Swanson]."

For the first time, on April 7, 2004, in his "Amended Witness and Exhibit List" filed in the professional malpractice case, Swanson specifically asserted that Ybarra terminated the representation on December 2, 1999, by written correspondence. Swanson identified a letter which purported to be from Ybarra, dated December 2, 1999, and which provided as follows:

"This letter is to inform you that since we aren't making any progress on my injury case, I have no other alternative but to look for other counsel to represent me on this matter. So as of December 02, 1999 you are hereby terminated. As to my case file please **let me know when I can pick it up**."

Other than the words in bold and the date, the letter dated December 2, 1999, is identical to the letter dated May 24, 2000. Notwithstanding the alleged existence of the December 2, 1999, letter, the date of this letter was not specifically referred to or identified in Swanson's previous correspondence. Additionally, a copy of the December 2, 1999, letter was not in the materials provided to Barger's employee on June 8, 2000.

At the hearing on this matter, Ybarra testified that he did not terminate Swanson's representation in December 1999. Ybarra clearly testified that he did not terminate Swanson's representation until May 24, 2000. Ybarra testified that he threatened to terminate

Swanson's representation earlier, although he could not recall specifically when that was. Ybarra also testified that he might have prepared a letter sometime in December 1999, but he never sent it because Swanson talked him out of firing him.

During a hearing in the professional negligence case, the district court asked Swanson why he had not previously produced the December 2, 1999, letter. The exchange was as follows:

"THE COURT: Why wasn't the letter produced?

"MR. SWANSON: Your Honor, I don't know why the letter was not produced. I had a flood in my office on May 15th of '03, and I have had all kinds of files that I have rearranged and transferred and tried to pull apart because they were stuck together, and I can't tell you why it was not produced. There was no intent on [my part] to not produce this document. I think that—this document is the same document that [Ybarra], himself, has been aware of since December of 1999, so this is no surprise to [Ybarra] at all about this document. This December 2, 1999 document written by [Ybarra] terminating me as his attorney of record, that document has been in [Ybarra]'s possession. [He] knew of that document, and why [Ybarra] did or did not tell [his] attorney, I don't know. But there's no surprise about that document. . . . Well, I can't tell you that I lost it in the flood. I'm not trying to make up things. I'm telling you that this file, along with a whole bunch of files, were in disarray because they were sitting on the floor, and I had four inches of water."

At the disciplinary hearing, Swanson explained why he did not produce the December 2, 1999, letter earlier in a number of different ways. He testified that he had a flood in his office, it was a frivolous claim and the jury agreed with him, he could not locate the original copy of the letter and Ybarra's daughter later gave him a copy of the letter after Ybarra moved out of the family home, he did not know why he did not produce the letter, and he did not produce the letter earlier because he was confident a jury of 12 people would believe him that Ybarra fired him before the statute of limitations ran.

In addition to the December 2, 1999, letter, Swanson identified an exhibit that he asserted established that Ybarra and Barger had a meeting on December 8, 1999. The exhibit consisted of a business card and a receipt held together by a paper clip. Later, Swanson explained that he received the items from Christine Baeza, Ybarra's estranged daughter. Swanson asserted that because

a receipt dated December 8, 1999, was clipped to Barger's business card, that Ybarra and Barger had met. Ultimately, Swanson did not introduce at trial the December 2 letter or the business card clipped together with the receipt.

Following the trial on Ybarra's professional malpractice claim against Swanson, the jury issued a special verdict form. The jury found Ybarra to be 45 percent at fault and Swanson to be 55 percent at fault for negligently failing to obtain service of process before the expiration of the statute of limitations. In answering another special question, the jury found that Ybarra terminated Swanson's representation before the statute of limitations expired. Further, the jury found Lopez 100 percent and Schultz 0 percent at fault for the car accident. The special verdict form instructed the jury that if it found Schultz to be 0 percent at fault, it did not need to consider any additional issues.

About 6 months later, on December 29, 2004, Ybarra filed a complaint against Swanson with the Disciplinary Administrator's office. In February 2005, the Disciplinary Administrator wrote to Swanson and directed him to file a written response to the complaint within 20 days. He failed to do so within that time period. On March 9, 2005, however, Swanson wrote to Glenn Kerbs, the Chairman of the Southwest Kansas Bar Association's Ethics and Grievance Committee, and informed him that the matters between Ybarra and himself had been concluded in his favor following a jury trial.

The hearing panel found that Swanson violated the following rules in connection with his representation of Ybarra: KRPC 1.1 for failing to obtain timely service of process on the defendants in Ybarra's personal injury case; KRPC 1.3 for failing to properly prosecute Ybarra's personal injury case and for failing to timely obtain service of process on the defendants; KRPC 1.5 for failing to have a written contingent fee contract with Ybarra; KRPC 1.16(a)(3) for failing to properly withdraw once Swanson's services were terminated by Ybarra and failing to properly protect Ybarra's interests once the representation was terminated; KRPC 3.2 for failing to expedite Ybarra's litigation; KRPC 4.1 for knowingly and intentionally asserting that Ybarra terminated the representation on De-

cember 2, 1999, when Ybarra did not terminate Swanson's representation until May 24, 2000; and KRPC 8.4(c) for testifying at the disciplinary hearing that he received a December 1999 letter from Ybarra and testifying that Ybarra terminated the representation in December 1999.

## Swanson's Disputes Regarding Ybarra's Complaint

In his brief, Swanson admitted to a violation of KRPC 1.5(d) for failing to establish a written contingent fee agreement with Ybarra but took issue with the other findings of the hearing panel relating to Ybarra's termination of Swanson's representation.

Then at the hearing before this court, Swanson advised that he was not disputing that he violated KRPC 1.1 (competence), KRPC 1.3 (diligence), KRPC 1.5 (fees), KRPC 1.16 (declining or terminating representation), and KRPC 3.2 (expediting litigation). While his admission at the court hearing is sufficient for us to deem the violation to be admitted, we also note that our review of the record reveals clear and convincing evidence of these violations.

Swanson's disputes, therefore, relate to the panel's findings that he violated KRPC 4.1 for knowingly and intentionally asserting that Ybarra terminated the representation on December 2, 1999, when Ybarra did not terminate Swanson's representation until May 24, 2000 and that he violated KRPC 8.4(c) for testifying at the disciplinary hearing that he received a December 1999 letter from Ybarra and testifying that Ybarra terminated the representation in December 1999.

Swanson argues these findings are contrary to the jury verdict in the federal malpractice case in which the jury found that Ybarra terminated the representation on December 2, 1999. To support his argument, he cites Supreme Court Rule 202 (2008 Kan. Ct. R. Annot. 261) (grounds for discipline), which provides that civil judgments are prima facie evidence of the findings made therein and shall raise a presumption as to their validity. Swanson relies on the rule to argue that, because of the jury's verdict in the federal malpractice case, there is a presumption that Ybarra terminated his representation in December 1999.

Conclusions Regarding Ybarra's Complaint

Supreme Court Rule 202 has generally been applied in cases where a judgment has been made *against* the respondent. See, *e.g.*, *In re Rumsey*, 276 Kan. 65, 75, 71 P.3d 1150 (2003) ("The respondent bears the burden of disproving the findings in the civil judgment."). Nevertheless, the hearing panel stated, "[p]ursuant to the language of the rule, it appears that a judgment based only on a preponderance of the evidence standard can be overcome regardless of whether it tends to prove misconduct or disprove misconduct." Applying that interpretation to the case, the panel specifically concluded that the Disciplinary Administrator overcame the presumption and that Ybarra did not terminate Swanson until May 24, 2000, after the statute of limitations had expired.

The Disciplinary Administrator suggests two reasons why we should agree that there is clear and convincing evidence that overcomes the presumption created by the federal verdict. First, he argues that the jury's verdict was inconsistent in that it found Swanson 55 percent at fault for allowing the statute of limitations to run yet found Ybarra terminated Swanson's representation before the deadline for the service of process. Second, he suggests the jury in the federal malpractice case did not have the opportunity to consider the authenticity of the December 2, 1999, letter.

Regarding the first point, we disagree that the jury's verdict is inconsistent. Rather, there are at least two rationales that reconcile the answers. First, the jury could have determined that Ybarra terminated Swanson's representation on December 2, 1999, but that Swanson was still at fault for not diligently pursuing service before that date. Second, the jury could have concluded that Swanson did not adequately protect Ybarra's interests when the representation was terminated, even assuming the termination occurred in December. Swanson did not file a motion to withdraw and there is no evidence that he sent a letter or notice to Ybarra communicating the status of the court case or emphasizing the looming statute of limitations.

In the hearing before this court, Swanson was asked whether he had complied with KRPC 1.16(d), which states:

"Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned."

The comments to KRPC 1.16 include one which clarifies that "[e]ven if the lawyer has been unfairly discharged by the client, a lawyer must take all reasonable steps to mitigate the consequences to the client." Swanson admitted to this court that he violated KRPC 1.16.

Similarly, a jury could have felt that, even post-termination, Swanson still had responsibilities that he failed to fulfill and that the failure made him 55 percent responsible for the failure to obtain service of process before expiration of the statute of limitations. Hence, we are not willing to discount the jury's verdict.

That leaves the Disciplinary Administrator's second argument that the jury did not have the opportunity to consider the authenticity of the December 2, 1999, letter. Granted, there was some difference in the evidence heard by the panel as compared to that heard by the jury. Nevertheless, because two fact-finding bodies reached different conclusions, a majority of this court finds it cannot conclude it is "highly probable" that a factfinder would determine the termination occurred in May 2000 rather than December 1999.

Even so, the hearing panel made another finding of dishonesty with regard to Swanson's testimony regarding the Ybarra complaint. The panel stated:

"Furthermore, the Respondent testified falsely when he testified that he did not receive the May 24, 2000, letter from Mr. Ybarra. Ms. Barger clearly testified that she received a copy of the May 24, 2000, letter when she obtained a copy of the Respondent's file."

Swanson does not specifically address this finding, and we find it is supported by clear and convincing evidence. Therefore, in this regard, we find that the Disciplinary Administrator met the burden of establishing a violation of KRPC 8.4(c), which prohibits conduct involving dishonesty, fraud, deceit, or misrepresentation. Nevertheless, because this violation did not occur during the course of

representing a client, we conclude the Disciplinary Administrator failed to meet the burden of establishing a violation of KRPC 4.1. See KRPC 4.1 (prohibiting knowingly making a false statement of material fact or failing to disclose a fact in the course of representing clients).

As a result, with regard to Swanson's representation of Ybarra, we find clear and convincing evidence supports the hearing panel's findings that Swanson violated KRPC 1.1 (competence); KRPC 1.3 (diligence); KRPC 1.5(d) (fees); KRPC 1.16(a)(3) and (d) (declining or terminating representation); KRPC 3.2 (expediting litigation); KRPC 8.1 (bar admission and disciplinary matters); KRPC 8.4 (misconduct); and Supreme Court Rule 207(b) (duties of the bar and judiciary).

### DA9520—Complaint filed by Barbara M.

The hearing panel found the following facts regarding the complaint of Barbara M., who had retained Swanson to file a divorce action on her behalf. In November 2003, Swanson filed the divorce in Seward County, Kansas, and the district court granted the divorce on March 8, 2004.

According to the divorce decree, prepared by Swanson, Barbara M. was to receive $15,000 of the proceeds of her husband's KPERS retirement account. Swanson, however, failed to prepare the Qualified Domestic Relations Order (QDRO) authorizing the division of the retirement account. Barbara M. learned of this in December 2004 and thereafter began calling Swanson's office to discuss the status of the QDRO with him. Barbara M.'s numerous telephone calls went unanswered.

On April 7, 2005, Barbara M. filed a complaint with the Disciplinary Administrator's office. In her complaint, in addition to complaining that Swanson failed to prepare and file the QDRO, Barbara M. also noted errors in the divorce decree. Approximately a week after she filed her complaint, on April 15, 2005, Swanson prepared and filed the QDRO, but he never rectified the errors in the divorce decree.

The hearing panel concluded that in connection with Swanson's representation of Barbara M., he violated KRPC 1.1 for failing to

prepare the QDRO on her behalf; KRPC 1.3 for failing to timely file the QDRO on her behalf; and KRPC 1.4 for failing to return her telephone calls and to provide her with updates on the status of the representation.

## Swanson's Disputes Regarding Barbara M.

In his brief, Swanson refused to take full responsibility for the failure to prepare the QDRO, arguing that the district court did not order him to prepare a QDRO dividing the KPERS retirement account. He did admit, however, that he could have prepared the QDRO sooner and that he could have obtained the proper forms more expeditiously. Swanson further admitted that he failed to return some of Barbara M.'s phone calls and that he should have kept his client better informed.

That being said, Swanson's lack of true recognition regarding his misconduct is emphasized by his contention that "[t]here was no dishonest or selfish motiv[ated] conduct on behalf of the Respondent" and that he "did not ask for, or receive an extra fee for preparing the QDRO."

Swanson's tone changed somewhat, however, when he admitted to this court that he had committed the violations that related to his representation of Barbara M.

## Conclusions Regarding Barbara M.'s Complaint

While Swanson's admissions before this court seems to settle the question, our own review of the record causes us to conclude there is clear and convincing evidence to support the hearing panel's findings that Swanson violated KRPC 1.1 (competence), KRPC 1.3 (diligence), and KRPC 1.4 (communication).

### Sanction

Based upon the violations, the hearing panel unanimously recommended indefinite suspension. Their recommendation is based on the following analysis:

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards.') Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or

actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated*. The Respondent violated his duty to his clients to provide competent and diligent representation. The Respondent violated his duty to his clients to provide reasonable communication. The Respondent violated his duty to the legal system to expedite litigation. The Respondent violated his duty to the public to maintain personal integrity. The Respondent violated his duty to the legal profession to cooperate in [the] disciplinary investigation.

"*Mental State*. The Respondent knowingly violated his duties.

"*Injury*. As a result of the Respondent's misconduct, the Respondent caused actual serious injury to Mr. Chapman and Mr. Ybarra. Specifically, but for the Respondent's misconduct, Mr. Chapman would have most likely been required to pay substantially less in child support. Additionally, as a direct result of the Respondent's misconduct, Mr. Ybarra lost his ability to collect $114,000 in damages. Finally, the Respondent caused potential injury to [Barbara M.].

"*Aggravating or Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"Prior Disciplinary Offenses. The Respondent has been previously disciplined on one occasion. Specifically, on April 25, 2003, the Disciplinary Administrator informally admonished the Respondent for KRPC 1.4.

"Dishonest or Selfish Motive. The Respondent's misconduct was motivated by dishonesty and selfishness.

"The Respondent failed to timely file a motion to modify in behalf of Mr. Chapman. Thereafter, the Respondent attempted to avoid responsibility by falsely asserting that Mr. Chapman failed to provide him with necessary financial documentation and that Mr. Chapman never requested that the Respondent file a motion to modify child support.

"The Respondent's misconduct regarding Mr. Ybarra was likewise motivated by dishonesty and selfishness. The Respondent failed to properly obtain service of process on the defendants. Thereafter, in an effort to avoid responsibility, the Respondent falsely asserted that Mr. Ybarra terminated the Respondent's representation prior to the expiration of the statute of limitations.

"Additionally, the Respondent's assertion that Ms. Barger's business card and a receipt held together by a paper clip somehow establishes that Ms. Barger and Mr. Ybarra had a meeting is unbelievable. Further, the Respondent's assertion that the receipt may have been evidence that Mr. Ybarra mailed something to Ms. Barger is not supported even by the receipt itself. The receipt includes a charge for tax and postage is not taxable. The speculation that the Respondent engaged in, in representing to the federal court that the business card and receipt held together by a paper clip establish that Ms. Barger and Mr. Ybarra met in December 1999, is dishonest.

"Thus, the Hearing Panel concludes that the Respondent's misconduct was motivated by dishonesty and selfishness.

"A Pattern of Misconduct. Included in this case are three complaints. The complaints involve similar misconduct. Accordingly, the Respondent engaged in a pattern of misconduct.

"Multiple Offenses. The Respondent violated KRPC 1.1, KRPC 1.3, KRPC 1.4, KRPC 1.5, KRPC 1.16(a)(3), KRPC 1.16(d), KRPC 3.2, KRPC 4.1, KRPC 8.1, KRPC 8.4(c), Kan. Sup. Ct. R. 207(b), and Kan. Sup. Ct. R. 211(b). As such, the Respondent committed multiple offenses.

"Bad Faith Obstruction of the Disciplinary Proceeding by Intentionally Failing to Comply with Rules or Orders of the Disciplinary Process. The Respondent knew that he was required to provide the disciplinary investigator with certain requested items and answer a number of questions. The Respondent never provided the investigator with the requested items nor did he answer the questions. The Hearing Panel, therefore, concludes that the Respondent obstructed the disciplinary proceeding.

"Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process. The Respondent provided false testimony during the disciplinary hearing.

"For example, the Respondent testified falsely when he testified that [he] did not receive a copy of the release and when he testified that neither Mr. Chapman, Mrs. Chapman, nor Mrs. Madden requested that he file a motion to modify child support after Mr. Chapman was released from the Cleveland Browns."

The hearing panel then made those findings regarding the Chapmans' credibility that have been previously quoted. After determining that Mrs. Chapman's testimony was clear and convincing, the panel continued:

"[T]he Hearing Panel concludes that the Respondent engaged in a deceptive practice or knowingly testified falsely when he testified as follows:

'Q. [By Mr. Hazlett] Okay. . . . In August of 2002 or around that time, do you recall being contacted by Mr. Chapman or Aris Chapman about the fact that he had sustained an additional injury to his leg?

'A. [By the Respondent] I think somebody mentioned that to me, yes.

'Q. Do you know who that would have been?

'A. No, I don't. I don't have any record of anybody sending me any documents or letters or anything. It might have been his mother.

'Q. Okay. Did you receive any information from Mr. Chapman or any family member verifying that he had sustained an injury and had been released?

'A. I don't have anything in my file that indicates that.

'Q. Ms. Chapman or Mr. Chapman indicated in his complaint letter that he faxed the release letter to you in August of 2002. Do you recall that happening?

'A.   No, I don't. And I know that that's what they're claiming, but they gave me some information in August of '02, but I don't have any of that in my file.

'Q.   They also claim that they had a conversation with you in which you said that the fax didn't come through and you asked them to mail the faxed letter to you and they indicated that they did that. Is it your testimony that they did not do that?

'A.   I have no idea if they did that or not, but I don't have it in my file.

'Q.   Do you have any correspondence in your file—I mean, you've looked through your file; is that correct?

'A.   Yes.

'Q.   Do you have any correspondence in your file from you to the Chapmans or to Mr. Chapman during this time?

'A.   I don't think so at that time. The only—everything that we did was me talking to his mother and talking about, you know, making the payments. And then when they gave me the documents in '03 to file the motion to reduce. Not in '03, excuse me, the '03 tax return. I said that wrong.

'Q.   So is it—just to kind of clarify this in my own mind, is it your testimony that you don't recall the release letter being sent to you or it was not sent to you?

'A.   I don't know if they sent it or not. I'm just telling you that I don't recall it being in my file.

'Q.   And you didn't recall receiving it?

'A.   And I don't recall receiving it.

'CHAIRMAN [of the hearing panel]: Mr. Swanson, in August of 2002, did Mr. Chapman contact you and indicate that he had sustained an injury, he was being released, and he wanted you to file a motion to reduce his child support?

'MR. SWANSON: No.

'CHAIRMAN . . . : No.

'MR. SWANSON: No.

'CHAIRMAN . . . : You did receive information during that period of time that he had received an injury and was being released from his contract?

'MR. SWANSON: His mother came in and was talking in general about him and about his status with the NFL. And what I was trying to focus on—when you're talking August of '02, what I kept telling them we have a May '02 contempt for not paying and in May '02 you're already not paying and I said you've got to get that paid so you don't go to jail. That's what we were focusing on. And he wouldn't pay. So I don't have any—there's nothing specific that I know of in my file that says that you need to file a motion to reduce support in August of '02.

'CHAIRMAN . . . : The fact that Mr. Chapman may or may not have been in arrears in the payment of child support would not have precluded you filing a motion to reduce his child support, would it?

'MR. SWANSON: Well, certainly not, no.

'CHAIRMAN . . . : So it's your testimony that no one associated with Mr. Chapman asked you to file a motion to reduce the child support—

'MR. SWANSON: No.

'CHAIRMAN . . . : —as a result of the change in circumstances, which was the injury to his leg?

'MR. SWANSON: No, I don't— I mean, his mother—I was talking to his mother about it and I don't recall anything specific about that. I mean, I would have filed it. I filed two previous motions and there's no reason why I wouldn't file it.' "

After quoting this excerpt from the record, the panel cited Swanson's dishonest conduct relating to Ybarra's complaint, specifically his false testimony regarding the date of termination and regarding whether he received the May 24, 2000, letter from Mr. Ybarra.

The panel continued:

"Later, during the hearing, the Respondent acknowledged that Ms. Barger must have received the May 24, 2000, letter and that he did not disbelieve her.

"Refusal to Acknowledge Wrongful Nature of Conduct. The Respondent refused to acknowledge the wrongful nature of much of his conduct. While the Respondent admitted that he failed to reduce Mr. Ybarra's contingent fee agreement to writing and that he failed to complete [Barbara M.'s] QDRO as quickly as he might have, the Respondent refused to acknowledge any other misconduct.

"Vulnerability of Victim. Mr. Chapman, Mr. Ybarra, and [Barbara M.] were vulnerable to the Respondent's misconduct.

"Substantial Experience in the Practice of Law. The Kansas Supreme Court admitted the Respondent to practice law in 1974. At the time the Respondent engaged in misconduct, the Respondent had been practicing law for more than 25 years. Accordingly, the Hearing Panel concludes that the Respondent had substantial experience in the practice of law at the time he engaged in the misconduct.

"Indifference to Making Restitution. To date, the Respondent has made no effort to make restitution to Mr. Chapman or Mr. Ybarra for the damage he caused."

Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel found the following mitigating circumstance present:

"Previous Good Character and Reputation in the Community Including any Letters from Clients, Friends, and Lawyers in Support of the Character and General Reputation of the Attorney. Christina Baeza testified that the Respondent is an honest man."

All of these findings were made in the panel's preliminary report, which did not suggest the appropriate sanction. The panel reserved that determination until after it had received the parties' supplemental written arguments. In Swanson's supplemental argument, he suggested an admonition would be appropriate punishment, but he did not cite an ABA Standard for support. The Disciplinary Administrator suggested that ABA Standards 4.42, 4.62, and 6.11 were applicable. Standard 4.42 provides:

"Suspension is generally appropriate when:
    (a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or
    (b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client."

## Standard 4.62 provides:

"Suspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client."

## Standard 6.11 provides:

"Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding."

The Disciplinary Administrator suggested indefinite suspension would be the most appropriate sanction and that the payment of full restitution should be a requirement for reinstatement.

After receiving each party's recommendations, the hearing panel deliberated and considered the applicable ABA Standards. In addition to the Standards suggested by the Disciplinary Administrator, the hearing panel found ABA Standard 4.41, 5.11, and 7.2 were also applicable. Standard 4.41 provides:

"Disbarment is generally appropriate when:
. . . .
(b) a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; or
    (c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client."

Standard 5.11 states:

"Disbarment is generally appropriate when:

. . . .

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice."

Finally, Standard 7.2 provides:

"Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system."

In making its recommendation for sanctions, the hearing panel expressed that it was disturbed by Swanson's conduct in this case. The panel observed that this court recently decided a case that is similar in nature to this case: *In re Bishop*, 285 Kan. 1097, 179 P.3d 1096 (2008).

In *Bishop*, the respondent provided false information to his clients regarding the status of the representation for an extended period of time. While acknowledging that each disciplinary sanction must be based upon the specific facts and circumstances of the violations and the aggravating and mitigating circumstances presented in the case, because of similarities, the hearing panel believed a comparison was warranted. The hearing panel, therefore, quoted the following passage from *Bishop*:

"Bishop engaged in clearly intentional conduct that caused serious injury. Bishop knowingly failed to perform services for a client and, for years, knowingly lied about that conduct. Bishop's deceptions continued even after the complaints as seen by the varied explanations Bishop gave during the course of these proceedings. Additionally, Bishop has been disciplined once previously.

"Given the facts of this case, particularly the long period of intentional deception, we conclude indefinite suspension is appropriate." 285 Kan. at 1109.

Based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel stated that an argument could be made for Swanson's disbarment. But based upon the specific facts and circumstances of the violations and the aggravating and mitigating circumstances presented in the case, the hearing panel unanimously recommended that Swanson be indefinitely suspended from the practice of law in the state of Kansas. Nev-

ertheless, the panel did not adopt the Disciplinary Administrator's recommendation that restitution be required before reinstatement.

As we review the parties' positions and the panel's recommendations, we unanimously reject Swanson's suggestion of published censure. Under the facts and circumstances of this case, censure is not an appropriate discipline. Reprimand or censure is generally appropriate when a lawyer engages in negligent conduct that causes injury or potential injury to a client. See ABA Standards 4.43, 4.63, 7.3. Swanson's conduct was more than negligent; at least some of Swanson's conduct was clearly intentional. Therefore, as in *Bishop*, some length of suspension from the practice of law is an appropriate sanction.

In considering whether this suspension should be a disbarment or a lesser penalty, a majority of the court agrees with the hearing panel and the Disciplinary Administrator that suspension is a more appropriate remedy than disbarment; a minority of the court would impose the harsher penalty. As to the length of that suspension, the majority of the court notes the mitigating factors and concludes that Swanson should be suspended for a period of 2 years.

IT IS THEREFORE ORDERED that the respondent, J. Gregory Swanson, be and he is hereby disciplined by suspension from the practice of law in Kansas for a period of 2 years effective upon the filing of this opinion, in accordance with Supreme Court Rule 203(a)(2) (2008 Kan. Ct. R. Annot. 266), for violations of KRPC 1.1 (2008 Kan. Ct. R. Annot. 400) (competence); KRPC 1.3 (2008 Kan. Ct. R. Annot. 415) (diligence); KRPC 1.4 (2008 Kan. Ct. R. Annot. 432) (communication); KRPC 1.5 (2008 Kan. Ct. R. Annot. 448) (fees); KRPC 1.16(a)(3) and (d) (2008 Kan. Ct. R. Annot. 508) (declining or terminating representation); KRPC 3.2 (2008 Kan. Ct. R. Annot. 525) (expediting litigation); KRPC 8.1 (2008 Kan. Ct. R. Annot. 579) (bar admission and disciplinary matters); KRPC 8.4(c) (2008 Kan. Ct. R. Annot. 586) (misconduct); Supreme Court Rule 207(b) (2008 Kan. Ct. R. Annot. 295) (duties of the bar and judiciary); and Supreme Court Rule 211(b) (2008 Kan. Ct. R. Annot. 313) (formal hearings).

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 (2008 Kan. Ct. R. Annot. 350).

IT IS FURTHER ORDERED that the costs of this action be assessed to the respondent and that this order be published in the official Kansas Reports.